Case reversed and remanded by
Supreme Court opinion filed 3/21/01

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CRYSTAL M. FERGUSON; PAULA S.
HALE; ELLEN L. KNIGHT; PATRICIA R.
WILLIAMS; LORI GRIFFIN; PAMELA
PEAR; SANDRA POWELL; LAVERNE
SINGLETON; THERESA JOSEPH;
DARLENE M. NICHOLSON,
Plaintiffs-Appellants,

and

STATE-RECORD COMPANY,
INCORPORATED; THE EVENING POST
PUBLISHING COMPANY,
Intervenors-Plaintiffs,

v.

CITY OF CHARLESTON, South
Carolina; HARRISON L. PEOPLES, Dr.;                     No. 97-2512

THOMAS C. ROWLAND, JR., Dr.;
STANLEY C. BAKER, JR., Dr.;
CHARLES B. HANNA, Dr.;
COTESWORTH P. FISHBURNE, Dr.; E.
CONYERS O'BRYAN, Dr.; MELVYN
BERLINSKY; PATRICIA T. SMITH; M. J.
COOPER; HERBERT C. GRANGER;
ROBERT C. LAKE, JR.; PHILLIP D.
SASSER; CLAUDIA W. PEOPLES;
CARROLL V. BING, JR., Dr., as
Trustees of the Medical University
of South Carolina in their official
capacities; REUBEN GREENBERG;
CHARLES MOLONY CONDON; DAVID
SCHWACKE; SHIRLEY BROWN, R.N.;
EDGAR O. HORGER, III, M.D.;

VICTOR DEL BENE; JOHN SANDERS;
WILLIAM B. PITTARD, M.D.; ROGER
NEWMAN, M.D.; HAROLD BIVENS,
M.D.; MELESIA HENRY, R.N.,
personally and in their official
capacities,
Defendants-Appellees.

CENTER FOR CONSTITUTIONAL RIGHTS,
Amicus Curiae.

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, Chief District Judge.
(CA-93-2624-2-12)

Argued: October 26, 1998

Decided: July 13, 1999

Before WILKINS and NIEMEYER, Circuit Judges,
and BLAKE, United States District Judge
for the District of Maryland, sitting by designation.

_____

Affirmed by published opinion. Judge Wilkins wrote the majority
opinion, in which Judge Niemeyer joined. Judge Blake wrote an opin-
ion dissenting in part.

_____

## COUNSEL

**ARGUED:** Priscilla Joyce Smith, CENTER FOR REPRODUCTIVE
LAW & POLICY, New York, New York, for Appellants. Barbara
Wynne Showers, Joseph Camden Wilson, IV, HOOD LAW FIRM,
L.L.C., Charleston, South Carolina, for Appellees. **ON BRIEF:**

Susan K. Dunn, Charleston, South Carolina, for Appellants. Robert H. Hood, HOOD LAW FIRM, L.L.C., Charleston, South Carolina, for Appellees. Kimani Paul-Emile, Barbara Olshansky, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York, for Amicus Curiae.

_____

## OPINION

WILKINS, Circuit Judge:

This litigation involves constitutional, statutory, and common-law challenges to a policy instituted by the Medical University of South Carolina (MUSC) in consultation with the Solicitor of the Ninth Judicial Circuit of South Carolina; the City of Charleston, South Carolina Police Department (CCPD); and various social services agencies. The policy was intended to encourage pregnant women whose urine tested positive for cocaine use to obtain substance abuse counseling. Appellants, ten women who were tested pursuant to the policy, brought this action claiming, inter alia, that the testing of their urine for evidence of cocaine use constituted a warrantless search in violation of the Fourth Amendment; that the policy had a racially disparate impact in violation of regulations implementing Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000d to 2000d-6 (West 1994 & Supp. 1998); that the disclosure of medical information to law enforcement personnel violated their constitutional right to privacy; and that MUSC personnel committed the state-law tort of abuse of process in administering the policy. The district court entered judgment for Appellees[1] on each of these claims at various stages of the litigation. For the reasons set forth below, we affirm.

_____

[1] The complaint filed by Appellants named as defendants the City of Charleston, South Carolina; the trustees of MUSC; CCPD Chief Reuben Greenberg; former Ninth Circuit Solicitor Charles Condon; current Ninth Circuit Solicitor David Schwacke; Nurse Shirley Brown; Nurse Melesia Henry; and several physicians and MUSC officials involved in obstetrical and neonatal care at MUSC. For ease of reference, we refer to these parties collectively as "Appellees." The parties evidently agree that only injunctive relief is being sought against those individual Appellees who are state officers sued in their official capacities. See Edelman v. Jordan, 415 U.S. 651, 677 (1974).

3

I.

In the fall of 1989, MUSC instituted a policy providing for the test-
ing of the urine of pregnant women suspected of cocaine use and for
the reporting, under certain circumstances, of test results to law
enforcement officials. The impetus behind the policy came from
Nurse Shirley Brown, a case manager in the obstetrics department at
MUSC. Brown was concerned about a perceived rise in cocaine use
among pregnant women and the consequences for the health of the
users' children. Brown spoke with the General Counsel for MUSC
who in turn contacted the Ninth Circuit Solicitor (chief prosecuting
attorney) concerning the development of a policy to address the prob-
lem. Eventually, a task force was formed that included Nurse Brown,
the Solicitor, the Chief of CCPD, and doctors from various depart-
ments involved in perinatal care at MUSC. During the course of task
force meetings, the Solicitor informed the participants that because a
viable fetus was a "person" under South Carolina law, a woman who
ingested cocaine after the 24th week of pregnancy was guilty of the
crime of distributing a controlled substance to a person under the age
of eighteen, <u>see</u> S.C. Code Ann. § 44-53-440 (Law. Co-op. Supp. 1997).**2**

Pursuant to the policy formulated by the task force and imple-
mented in late October or early November 1989, urine drug screens
to detect evidence of cocaine use were given to all MUSC maternity
patients when certain indicia of cocaine use were present: (1) separa-
tion of the placenta from the uterine wall; (2) intrauterine fetal death;
(3) no prenatal care; (4) late prenatal care (beginning after 24 weeks);
(5) incomplete prenatal care (fewer than five visits); (6) preterm labor
without an obvious cause; (7) a history of cocaine use; (8) unex-
plained birth defects; or (9) intrauterine growth retardation without an
obvious cause. When a patient tested positive, the test result was
reported to CCPD or a representative of the Solicitor's Office and the

_____

**2** The South Carolina Supreme Court previously had held that a viable
fetus was a person within the meaning of South Carolina criminal law.
<u>See State v. Horne</u>, 319 S.E.2d 703, 704 (S.C. 1984). Subsequently, the
court upheld a conviction for criminal child neglect in a case involving
a woman who ingested cocaine while pregnant with a viable fetus. <u>See</u>
<u>Whitner v. State</u>, 492 S.E.2d 777, 778-84 (S.C. 1997), <u>cert. denied</u>, 118
S. Ct. 1857 (1998).

4

patient was arrested for distributing cocaine to a minor. In early 1990, the policy was amended so that a patient who tested positive for cocaine use was given a choice between being arrested and receiving drug treatment. Positive test results of a patient who elected drug treatment were not forwarded to CCPD, and the patient was not arrested, unless she tested positive for cocaine use a second time or failed to comply with treatment obligations. A patient who was arrested could avoid prosecution by completing a drug treatment program. Upon successful completion of such a program, the charges would be dismissed.**3**

---

**3** The dissent repeatedly characterizes Appellees' actions in implementing the policy as animated by a vindictive purpose to prosecute women who used cocaine during pregnancy. The record simply does not support this. Although the very real possibility of arrest was employed as an incentive for women to comply with treatment obligations, the record is abundantly clear that Appellees were motivated by a desire to protect the health of children born at MUSC, and that the policy was formulated and implemented with this goal in mind. Indeed, the district court so found. See J.A. 2739 (finding that the "goal [of the policy] was not to arrest patients but to facilitate their treatment and protect both the mother and unborn child"). And, the evidence in the record more than amply supports this finding. See, e.g., J.A. 583 (testimony of Nurse Shirley Brown) (confirming that the reason for the policy was "concern ... for the health and safety and care of these fetuses and soon to be children"); id. at 602 (testimony of Nurse Shirley Brown) (agreeing that"it was always the intention of you and the people at the Medical University of South Carolina, and in fact from what you learned at these meetings, [the] Charleston Police Department, ... [and] the Solicitor, to help the women get treatment, not to arrest them, not to prosecute them, not to cause them to go to jail"); id. at 779-80 (testimony of Solicitor Charles Condon) (stating that "the problem presented to us at that time [was], how to help these babies and how to stop the totally preventable damage being done to these innocent little children" and explaining that "[t]he policy from its inception was amnesty-based.... [I]f you lived up to some very basic requirements, number one being drug free, ... and, number two, if you would go to free drug treatment, not a thing would happen to you"); id. at 785-86 (testimony of Solicitor Charles Condon) ("The idea that we were involved in a prosecution program is almost laughable .... The idea was not to prosecute people and put them in jail, the idea was to use legal intervention that was working to change human behavior to protect children, to protect babies."); id. at 863 (testimony of MUSC's General Counsel) ("[T]his was not supposed to be a punitive policy where we

Implementation of the policy by MUSC involved substantial record keeping and educational efforts. A maternity patient whose urine tested positive for cocaine use was shown an educational video concerning the harmful effects of cocaine use during pregnancy and was given letters from the Solicitor's Office and the hospital staff relating to the policy. In addition, MUSC personnel advised the patient of the need to obtain substance abuse counseling and scheduled an initial appointment for such counseling. The patient then was given a document noting the date and time of the appointment. Additionally, MUSC maintained records on patients whose urine tested positive for cocaine use as a means of tracking them to ensure that they complied with the requirements of the policy.

Appellants, all of whom were subjected to the policy,[4] brought this action asserting, as pertinent here, infringement of their constitutional right to privacy; violation of their Fourth Amendment right to be free of unreasonable searches and seizures; disparate impact discrimination on the basis of race; and commission of the state-law tort of abuse of process. After presentation of the evidence, the district court granted judgment as a matter of law to Appellees on the claims of commission of abuse of process and violation of the right to privacy to the extent Appellants sought damages. The jury returned a verdict in favor of Appellees on the Fourth Amendment claim. At a post-trial hearing, the court denied injunctive relief on Appellants' claims of the denial of their constitutional right to privacy. Finally, the district court rendered findings of fact based on the evidence presented at trial and ruled in favor of Appellees on the Title VI claim of disparate impact discrimination.

_____

went out and punished people for doing something, even though we knew the activity was illegal. What we were trying to do is give those babies a chance to be born normal."). Indeed, while some of the Appellants were arrested, not one of them was prosecuted; this fact belies the dissent's assertion that a purpose of the policy was to convict and punish women who used cocaine during pregnancy.

[4] At least two Appellants were subjected to urine drug screens shortly before formal adoption of the policy. Testimony in the record indicates, however, that MUSC personnel began to apply the policy informally in October 1989.

On appeal, Appellants challenge the submission of the Fourth Amendment claim to the jury and the sufficiency of the evidence supporting the verdict; the decision of the district court granting judgment to Appellees on the Title VI claim; and the orders of the court granting Appellees judgment as a matter of law on the claims for violation of the constitutional right to privacy and commission of the tort of abuse of process. We review these issues seriatim.

II.

At trial, Appellants contended that the urine drug screens constituted searches within the meaning of the Fourth Amendment. They further claimed that because they did not consent to the screens, the tests violated the Fourth Amendment.[5] The district court ruled that the urine screens fell within the ambit of the Fourth Amendment and submitted the question of whether Appellants had consented to the searches to the jury, which found in favor of Appellees. Appellants now maintain that the district court erred in submitting the issue of consent to the jury and, alternatively, that the verdict is not supported by the evidence. We find it unnecessary to address these contentions because we affirm on the basis that the searches were reasonable as special needs searches.

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, provides in pertinent part that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures[ ] shall not be violated." U.S. Const. amend. IV; see Mapp v. Ohio, 367 U.S. 643, 655 (1961). Simply put, this amendment guarantees that governmental intrusions into privacy by means of searches or seizures must be reasonable. Typically, this reasonableness requirement acts as a constraint on governmental authority to undertake a search or seizure in the absence of individualized suspicion. See Chandler v. Miller, 520 U.S. 305, 308 (1997). Generally, a search performed without a warrant is unreasonable per se unless it fits within a narrowly defined exception to the warrant requirement. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en

_____

[5] MUSC personnel did not obtain warrants before conducting the urine drug screens.

7

banc). Nevertheless, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." <u>National Treasury Employees Union v. Von Raab</u>, 489 U.S. 656, 665 (1989). Rather, there are situations in which "a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement." <u>Id.</u> In such cases, "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." <u>Id.</u> at 665-66; <u>see Chandler</u>, 520 U.S. at 314 (explaining that"[w]hen ... `special needs'--concerns other than crime detection--are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties"). This balancing requires consideration of the governmental interest prompting the invasion; the effectiveness of the intrusion, <u>i.e.</u>, the degree to which the intrusion reasonably is thought to advance the governmental interest; and the magnitude of the intrusion upon the individuals affected, from both a subjective and objective standpoint. <u>See Michigan Dep't of State Police v. Sitz</u>, 496 U.S. 444, 455 (1990); <u>id.</u> at 451-55 (applying test); <u>DesRoches v. Caprio</u>, 156 F.3d 571, 574 (4th Cir. 1998).

The parties evidently have agreed throughout this litigation that MUSC is a state hospital and that MUSC employees therefore are government actors.**6** And, the district court found as a fact that MUSC personnel conducted the urine drug screens for medical purposes wholly independent of an intent to aid law enforcement efforts.**7**

_____

**6** Our analysis is premised on the assumption that when a state hospital develops a general policy to test the urine of certain patients suspected of drug use, the testing constitutes a search within the meaning of the Fourth Amendment. <u>But cf. United States v. Attson</u>, 900 F.2d 1427, 1432-33 (9th Cir. 1990) (holding that government-employed doctor who, for medical purposes, tests a patient's urine for evidence of alcohol use does not conduct a search within the meaning of the Fourth Amendment unless he "act[s] with the intent to assist the government in its investigatory or administrative purposes and not for an independent purpose").
**7** The district court declined to hold the searches at issue here reasonable under a special needs analysis because law enforcement officers

8

Accordingly, the question presented is whether a balancing of MUSC's interest in protecting the health of children whose mothers use cocaine during pregnancy, the effectiveness of the policy to identify and treat women who use cocaine during pregnancy, and the degree of intrusion experienced by women whose urine was tested for evidence of cocaine use results in a conclusion that the searches violated the Fourth Amendment.

A.

The first factor to be considered is the governmental need. The Fourth Amendment does not require a governmental need that is compelling in an absolute sense. See Vernonia Sch. Dist. 47J v. Acton,

_____

were involved in the formulation of the policy. However, the involvement of law enforcement officers does not make a special needs analysis inappropriate. See Sitz, 496 U.S. at 451-55 (upholding, under a special needs balancing test, a sobriety checkpoint operated by uniformed police officers); Norwood v. Bain, 166 F.3d 243, 245 (4th Cir. 1999) (en banc) (per curiam), cert. denied, ___ U.S.L.W. ___, 1999 WL 296948 (U.S. June 14, 1999) (No. 98-1777).

The dissent makes the related argument that the use of evidence obtained during the searches to support the arrest of some patients precludes application of the special needs balancing test. We disagree with this proposition, as does the Supreme Court. See Griffin v. Wisconsin, 483 U.S. 868, 870, 875-77 (1987) (determining that warrantless search based on reasonable grounds was justified by the special needs of the Wisconsin probation system even though evidence gathered during the search was employed to support a criminal conviction); see also Sitz, 496 U.S. at 448 (noting that suspicionless stop at sobriety checkpoint resulted in arrest for driving under the influence). The dissent's attempt to distinguish Sitz is unpersuasive. It is true that the decision of the Court "address[ed] only the initial stop of each motorist passing through a checkpoint and the associated preliminary questioning and observation by checkpoint officers." Sitz, 496 U.S. at 450-51. However, the fact that the initial suspicionless seizures led ultimately to an arrest cannot have escaped the attention of the Court. If, as the dissent contends, the intent to use information obtained during a suspicionless seizure to further investigate and ultimately arrest an individual rendered the special needs analysis inappropriate, Sitz would have been decided differently.

9

515 U.S. 646, 661 (1995). Instead, the interest must be "<u>important enough</u> to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." <u>Id.</u>; <u>see Chandler</u>, 520 U.S. at 318. The hazard giving rise to the alleged special need must be a concrete danger, not merely a hypothetical one. <u>See Chandler</u>, 520 U.S. at 318-19; <u>Vernonia</u>, 515 U.S. at 662-63 (explaining that a sharp rise in drug use by student athletes supported school officials' assertion that random drug testing without individualized suspicion was warranted).

The policy at issue here was developed after medical personnel at MUSC noticed an alarming increase in the number of pregnancies affected by cocaine use. Maternal cocaine use is associated with a number of pregnancy complications, including low birth weight, premature labor, birth defects, and neurobehavioral problems. Even a single use of cocaine during pregnancy may result in separation of the placenta from the uterine wall--a condition that may threaten the life of the mother and the fetus--or a stroke in the fetus. Moreover, costs related to caring for infants exposed to cocaine in utero are substantial, as evidenced by the testimony of an expert for Appellants who testified that he had estimated in the late 1980s that such expenses nationwide might exceed three billion dollars annually over the next ten years. In light of the documented health hazards of maternal cocaine use and the resulting drain on public resources, MUSC officials unquestionably possessed a substantial interest in taking steps to reduce cocaine use by pregnant women. <u>Cf. Vernonia</u>, 515 U.S. at 661-62 (concluding that interest in deterring drug use by school children was important in light of severe effects of drug use on adolescents).

B.

The second factor, the effectiveness of the search, focuses on "the degree to which [it] advances the public interest." <u>Sitz</u>, 496 U.S. at 453 (internal quotation marks omitted). In analyzing this factor, however, our review must leave "the decision as to which among reasonable alternative ... techniques should be employed to deal with a serious public danger" to "the governmental officials who have a unique understanding of, and a responsibility for, limited public resources." <u>Id.</u> at 453-54.

10

Here, there can be little doubt that testing the urine of maternity patients when certain indicia of possible cocaine use were present was an effective way to identify and treat maternal cocaine use while conserving the limited resources of a public hospital. Indeed, prenatal testing was the only effective means available to accomplish the primary policy goal of persuading women to stop using cocaine during their pregnancies in order to reduce health effects on children exposed to cocaine in utero.

Appellants argue, however, that the policy was ineffective because it was both underinclusive and overinclusive. The policy was underinclusive, Appellants claim, because it did not address use of other drugs--such as alcohol and nicotine--that may pose risks to a developing fetus. And, Appellants maintain that the policy was overinclusive because women were tested on the basis of having received inadequate prenatal care, a factor that Appellants contend is more accurately associated with poverty than with cocaine use.

Neither of these assertions, even if true, has any bearing on the effectiveness of the means adopted to achieve the goal of identifying and treating maternal cocaine use among MUSC patients. The first fails because it addresses only the wisdom of the policy itself. And, the second fails because the fact that the criteria for testing under the policy did not necessarily correlate with cocaine use in all patients did not render those criteria ineffective. Accordingly, we conclude that the method chosen by MUSC officials was an effective one.**8**

_____

**8** The dissent maintains that the urine screens were not an effective means of identifying cocaine use by pregnant women because some patients were arrested after giving birth, when"any adverse effect of maternal cocaine use on the developing fetus had already occurred." Infra at 27. In applying the special needs balancing test, however, the proper focus is not on whether any arrests under the policy were an effective means of advancing the identified government interest, but rather on the effectiveness of the urine screens. Urine screens conducted up to the time of birth unquestionably were effective to determine whether a woman had used cocaine during her pregnancy and thus whether her child required treatment for prenatal exposure to cocaine.

11

C.

Finally, the degree of intrusion, both objective and subjective, suffered by Appellants was minimal. The objective intrusion suffered by an individual is "measured by the duration of the seizure and the intensity of the investigation." Id. at 452. The subjective level of intrusion is measured by the extent to which the method chosen minimizes or enhances fear and surprise on the part of those searched or detained. See id.

Generally, the privacy interests implicated by the collection and testing of urine are not minimal. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 626 (1989). The context in which the searches at issue here occurred, however, indicates that they were only minimally intrusive. In the first place, the collection and testing of urine was conducted in the course of medical treatment to which Appellants had consented. The giving of a urine sample is a normal, routine, and expected part of a medical examination. See Yin v. California, 95 F.3d 864, 870 (9th Cir. 1996) (observing that "[i]n today's world, a medical examination that does not include either a blood test or urinalysis would be unusual"). Therefore, on an objective level, the duration and intensity of the search indicate that the Fourth Amendment intrusion was minimal at best. Cf. Dimeo v. Griffin, 943 F.2d 679, 682 (7th Cir. 1991) (en banc) (indicating that a urine drug screen conducted in the course of a medical examination presents reduced privacy concerns). With respect to the subjective level of intrusion, we note that urine drug screens were conducted whenever one of the criteria for testing was met; a treating physician had no discretion to decline to order a urine test under the policy. See Turner v. Dammon, 848 F.2d 440, 446-47 (4th Cir. 1988) (explaining that "[t]he cases upholding warrantless administrative searches clearly establish that these rules require certainty, regularity, and neutrality in the conduct of the searches"). This fact, combined with the routine nature of urine testing in medical examinations, indicates that the searches were minimally intrusive on a subjective level.

D.

In sum, the rising use of cocaine by pregnant women among MUSC's patient base and the public health problems associated with

12

maternal cocaine use created a special need beyond normal law enforcement goals; the method chosen to address that need--testing the urine of pregnant women when indicia of possible cocaine use were present--effectively advanced the public interest; and the intrusion suffered by Appellants was minimal. Therefore, a balancing of these factors clearly demonstrates that the searches conducted were reasonable and thus not violative of the Fourth Amendment.

III.

Title VI provides in pertinent part that "[n]o person in the United States shall, on the ground of race, ... be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.A. § 2000d. Pursuant to Title VI, Appellants[9] challenged MUSC's policy of testing for and reporting cocaine use by pregnant women, maintaining that it disparately impacted African-American women.[10]

In order to succeed on a Title VI disparate impact claim, a plaintiff first must establish a prima facie case of discrimination by showing "that a facially neutral practice has a disproportionate adverse effect on a group protected by Title VI." Elston v. Talladega County Bd. of Educ., 997 F.2d 1394, 1407 (11th Cir. 1993). The burden then "shifts to the defendant to demonstrate the existence of a substantial legiti-

_____

[9] Of the ten Appellants, eight are African-American, one is of mixed race, and one is Caucasian.

[10] Although the statutory language of Title VI addresses only intentional discrimination, federal agencies that provide funds may prohibit disparate impact discrimination through regulations implementing Title VI. See Alexander v. Choate, 469 U.S. 287, 293 (1985) (discussing holdings of Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582 (1983)); New York Urban League, Inc. v. New York, 71 F.3d 1031, 1036 (2d Cir. 1995) (per curiam). The parties agree that at least one federal agency that provides funds to MUSC has promulgated regulations prohibiting disparate impact discrimination in the operations of programs or activities. See, e.g., 45 C.F.R. § 80.3(b)(2) (1997) (providing that recipients of funds from the Department of Health and Human Services may not, in furnishing services or benefits, "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race").

mate justification for the allegedly discriminatory practice." <u>New York Urban League, Inc. v. New York</u>, 71 F.3d 1031, 1036 (2d Cir. 1995) (per curiam) (internal quotation marks omitted). If the defendant succeeds in doing so, the plaintiff nevertheless will prevail by showing "that other less discriminatory means would serve the same objective." <u>Id.</u>

Here, Appellants maintained that the policy disproportionately affected African-Americans in several ways. Specifically, Appellants argued that African-Americans were disproportionately affected by application of the policy (1) only at MUSC; (2) only to certain departments at MUSC; and (3) only to cocaine. Appellants further asserted that the application of the factors utilized to determine which patients would be tested for cocaine use disproportionately affected African-Americans. The district court concluded that Appellants had failed to establish a prima facie case of discrimination with respect to any of the challenged practices. Additionally, the district court determined that even if a prima facie case of discrimination had been established, MUSC[11] had offered a legitimate justification for the policy--that it identified pregnant women who abused cocaine so that they could be referred for treatment. Further, the court held that Appellants had failed to carry their burden of establishing the existence of an equally

_____

[11] Appellants' counsel represented to the district court that Appellants were pursuing the Title VI claim only against MUSC. Appellants now contend, however, that this representation was "mistaken" and should be ignored by this court. Reply Br. of Appellants at 11. Even if we could do so, the evidence presented was inadequate to establish liability under Title VI against the Solicitor or the City of Charleston--the defendants to whom Appellants now point.

Our review of the record reveals nothing to support a conclusion that the Solicitor or the City of Charleston possessed authority to require other hospitals to implement the policy. Accordingly, Appellants failed to prove that either of these parties implemented a policy that resulted in a disparate impact on African-Americans. Indeed, the testimony of Solicitors Condon and Schwacke indicates that they unsuccessfully attempted to persuade other area hospitals to adopt policies similar to MUSC's; this testimony leaves the unmistakable impression that if either Solicitor could have forced health care providers to implement such a policy, he would have done so.

14

effective practice that would have a less disparate impact because the alternative practices offered by Appellants would have been prohibitively expensive.

Appellants now contend that the district court erred in concluding that they failed to establish a prima facie case of discrimination and to provide a viable, less discriminatory alternative. With respect to the establishment of a prima facie case, Appellants assert that the policy resulted in a disproportionate impact on African-Americans in two respects.

First, Appellants point to the fact that the policy was implemented only at MUSC and maintain that failure to apply the policy at all area hospitals resulted in a disproportionate effect on African-Americans. However, we need not consider whether the failure to apply the policy to all area hospitals would suffice to establish a prima facie case of discrimination. Because there is no evidence in the record to support a conclusion that MUSC could have forced other hospitals to adopt the policy, requiring MUSC to implement the policy at other area hospitals could not constitute a viable, less discriminatory alternative. Appellants consequently cannot prevail on this claim.

Second, Appellants maintain that MUSC's decision to target cocaine rather than all substances that are potentially harmful to fetuses--including nicotine and alcohol--disproportionately affected African-American women. In support of this contention, Appellants note that only 68 percent of maternity patients who tested positive for any drug were African-American, while 90 percent of maternity patients who tested positive for cocaine were African-American.[12] We

_____

[12] The district court rejected this argument, concluding without explanation that the relevant comparison was between the racial composition of the group of women who tested positive for cocaine use and the racial composition of the group of women who were arrested based on positive urine drug screens. The difference in the racial composition of these two groups, the court noted, was not statistically significant. We reject this reasoning. As the Supreme Court has noted, it is not sufficient for a defendant to show a racial balance at the end of a selection process; rather, the pertinent question for purposes of a disparate impact analysis is whether a given step in the process disproportionately affects members of one race. See Connecticut v. Teal, 457 U.S. 440, 450-51 (1982).

15

agree that this disparity--5.44 standard deviations--is sufficient to establish a prima facie case of disparate impact discrimination. See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 311 n.17 (1977) (observing that a variance "of more than two or three standard deviations" permits an inference of discrimination); Lewis v. Bloomsburg Mills, Inc., 773 F.2d 561, 568-69 & n.13 (4th Cir. 1985) (noting that variance of five to eight standard deviations permits an inference of discrimination).[13]

MUSC justified its decision to target cocaine on the basis of a perceived rise in the number of pregnant women abusing cocaine and the resistance of these women to obtaining treatment for their addictions. Appellants do not dispute that these are legitimate, nondiscriminatory reasons for MUSC's actions, but rather assert that at least two alternative practices exist which, if adopted, would have lessened the discriminatory impact of the policy: (1) reporting use of all illegal drugs and alcohol, and (2) testing all maternity patients. [14] The district court found that both of these practices would have been prohibitively expensive. See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 661 (1989) (explaining that determination whether alternative measures

_____

[13] In its memorandum opinion, the district court stated that the comparison was "between the MUSC maternity population and those who tested positive for cocaine." J.A. 2743. We need not resolve this ambiguity, however, because either comparison results in a statistical difference of greater than three standard deviations.

[14] Appellants also argue that other substances, including nicotine and alcohol, pose dangers to a fetus that are as great, or greater than, the dangers posed by cocaine. Appellants therefore assert that MUSC's decision to target cocaine--a drug predominantly used by African-Americans--is merely a pretext for discrimination. First, we note that this argument is relevant only to Appellants' claim of intentional racial discrimination, a claim that was rejected by the jury and that Appellants have not raised on appeal. Second, we find no evidence of pretext in MUSC's decision to target cocaine use--a problem that MUSC perceived as being particularly urgent--rather than testing for all potentially harmful substances. Cf. Bowen v. Owens, 476 U.S. 340, 347 (1986) (noting that "[t]his Court consistently has recognized that in addressing complex problems a legislature `may take one step at a time, addressing itself to the phase of the problem which seems most acute'" (quoting Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1955))).

16

exist that would serve the same purpose as a challenged practice with a less disparate impact should take into account whether the proposed alternatives impose undue costs or other burdens). With respect to the first alternative, Appellants point out that the urine drug screens conducted by MUSC indicated the past use of any drug, not just cocaine. Appellants do not challenge, however, the factual finding of the district court that application of the policy--including its tracking and reporting requirements--to all drugs would have been prohibitively expensive. Further, they do not assert that the district court committed clear error in finding that testing the urine of all maternity patients at MUSC would have been prohibitively expensive. Accordingly, we cannot conclude that Appellants have demonstrated the existence of a means of accomplishing the goals of the policy that would have been equally effective while imposing a less disparate impact on African-Americans. We therefore conclude that the district court correctly granted judgment to Appellees on the Title VI claim.

IV.

Next, Appellants maintain that the district court erred in rejecting their claim that the disclosure of information contained in their medical records to a representative of the Solicitor's Office and officers of the CCPD violated their constitutional right to privacy.[15] We conclude that any privacy interest Appellants possessed in their medical records was outweighed by a compelling governmental interest, particularly in light of the nonpublic nature of the disclosure.

The Constitution does not include a general right to privacy. See Condon v. Reno, 155 F.3d 453, 464 (4th Cir. 1998). Nevertheless, the

_____

[15] Appellants also contend that the actions of Nurse Laura Hildebrand, who disclosed medical information concerning Appellants at meetings of the Suspected Child Abuse and Neglect (SCAN) committee, violated their right to privacy. The district court concluded that even if these allegations of disclosure were correct, Appellants were not entitled to any damages based on the actions of Nurse Hildebrand because she was not a party defendant. Further, the court concluded that Appellants were not entitled to injunctive relief because the SCAN committee had been disbanded and there was no indication that it would be reconstituted at any point in the future. We affirm these rulings.

17

Supreme Court has recognized that individuals possess a constitutional "interest in avoiding disclosure of personal matters." <u>Whalen v. Roe</u>, 429 U.S. 589, 599 (1977). This interest, however, is limited to disclosures of information that touch on rights that "are fundamental or implicit in the concept of ordered liberty." <u>Paul v. Davis</u>, 424 U.S. 693, 713 (1976) (internal quotation marks omitted); <u>see Bloch v. Ribar</u>, 156 F.3d 673, 684 (6th Cir. 1998); <u>United States v. McFillin</u>, 713 F.2d 57, 60 (4th Cir. 1981) (holding that a constitutional right to privacy is implicated when the information disclosed "affects an essential component of a person's dignity"); <u>cf. Condon</u>, 155 F.3d at 464 (noting that the Supreme Court has recognized a constitutional right to privacy only with respect to certain limited areas, such as "matters of reproduction, contraception, abortion, and marriage" (citations omitted)). Moreover, even in those instances in which a constitutional right of privacy attaches to personal information, disclosure of that information will not violate the Constitution if "the government's interest in disseminating the information" outweighs "the individual's interest in keeping the information private." <u>Bloch</u>, 156 F.3d at 684.

Although the Supreme Court addressed a claim to a right of privacy in medical records in <u>Whalen</u>, it declined to decide whether such information merits constitutional privacy protection. <u>See Whalen</u>, 429 U.S. at 605-06. And, the circuit courts of appeals are divided on this issue. <u>Compare Doe v. Southeastern Pa. Transp. Auth.</u>, 72 F.3d 1133, 1137 (3d Cir. 1995) (recognizing that an individual possesses a constitutional privacy right in medical records), <u>with Jarvis v. Wellman</u>, 52 F.3d 125, 126 (6th Cir. 1995) (holding that no constitutionally protected privacy interest exists in medical records). We need not decide the question, however, because we conclude that even if Appellants possess a constitutional interest in the nondisclosure of their medical records, that interest is outweighed by the interest of the government in disclosure.

It is well settled that a state has a compelling interest in the identification of law breakers and in deterring future misconduct. <u>See Bloch</u>, 156 F.3d at 686; <u>Sanitation & Recycling Indus., Inc. v. New York</u>, 107 F.3d 985, 998 (2d Cir. 1997). Here, any medical records disclosed were disseminated only to a limited number of law enforcement personnel--the prosecuting attorney and arresting officers--in the

18

course of their official duties. There is no indication that Appellants' medical records were disclosed to others within the Solicitor's Office, the CCPD, or the public in general. See American Fed'n of Gov't Employees, AFL-CIO v. Department of Housing & Urban Dev., 118 F.3d 786, 793 (D.C. Cir. 1997) (holding "that the individual interest in protecting ... privacy ... is significantly less important where the information is collected by the government but not disseminated publicly"); Watson v. Lowcountry Red Cross, 974 F.2d 482, 487-88 (4th Cir. 1992) (indicating that disclosure of information to a district court did not abridge constitutional privacy interest because the disclosure was not public). Accordingly, we hold that no privacy right of Appellants was violated.

V.

Finally, Appellants maintain that the district court erred in granting Appellees judgment as a matter of law on the claim that the manner in which the policy was applied constituted the state-law tort of abuse of process. More specifically, Appellants assert that MUSC personnel improperly threatened Appellants with arrest in order to coerce them into obtaining substance abuse counseling.

Under South Carolina law, "[t]he essential elements of abuse of process are: (1) an ulterior purpose; and (2) a wilful act in the use of the process not proper in the regular conduct of the proceeding." Johnson v. Painter, 307 S.E.2d 860, 860 (S.C. 1983). "The improper purpose usually takes the form of coercion to obtain a collateral advantage[] not properly involved in the proceeding itself." Hainer v. American Med. Int'l, Inc., 492 S.E.2d 103, 107 (S.C. 1997). In order to satisfy the requirement of an improper act, the plaintiff must show that the defendant made "[s]ome definite act or threat not authorized by the process or aimed at an object not legitimate in the use of the process .... There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." Id.

Here, the district court determined that MUSC personnel did not have an improper ulterior purpose in advising women who tested positive for cocaine use that they would be subject to arrest if they did not obtain substance abuse counseling. Since Appellees did not seek

19

to obtain any collateral advantage for themselves, the court reasoned, there could be no abuse of process. We need not decide whether Appellees had an ulterior purpose, however, because we conclude that they performed no act not authorized by the process. At most, Appellees accurately informed Appellants that ingestion of cocaine after the 24th week of pregnancy constituted a criminal offense for which they could be prosecuted. That maternity patients who tested positive for cocaine use could avoid criminal prosecution by obtaining treatment does not render the implementation of the policy abusive. Cf. Johnson, 307 S.E.2d at 861 (holding that offer to abandon criminal prosecution in exchange for restitution did not amount to abuse of process).

VI.

In sum, we reject Appellants' challenges to the judgments in favor of Appellees. Accordingly, we affirm.

AFFIRMED

BLAKE, District Judge, dissenting in part:

The majority has concluded that the warrantless testing of urine for evidence of cocaine use which resulted in the arrest of nine of the 10 plaintiffs in this case constituted a reasonable search under the "special needs" exception to the warrant requirement of the Fourth Amendment. On this point, respectfully, I dissent. Furthermore, I disagree with the majority's conclusion that as to the Title VI claim the appellants failed to demonstrate the existence of a less discriminatory alternative policy. Accordingly, I would reverse the district court's decisions concerning the appellants' Fourth Amendment and Title VI claims and remand for consideration of appropriate relief.

I.

Some additional factual background is necessary to explain my position on the Fourth Amendment issue. Preliminarily, assuming that concern for the health of fetuses being carried by pregnant women using crack cocaine was a motivating force in the development of the

MUSC policy, it nevertheless is clear from the record that an initial and continuing focus of the policy was on the arrest and prosecution of drug-abusing mothers, either before or after they had given birth to the children presumably affected by the cocaine use.[1] The prosecutorial purpose of the policy and the substantial involvement of law enforcement officials from the very beginning of its implementation are both illustrated by a letter sent by MUSC General Counsel Joseph C. Good to Charles Condon, Charleston City Solicitor, on August 23, 1989. In the letter, Mr. Good wrote:

> I read with great interest in Saturday's newspaper accounts of our good friend, the Solicitor for the Thirteenth Judicial Circuit, prosecuting mothers who gave birth to children who tested positive for drugs. . . .
>
> Please advise us if your office is anticipating future criminal action and what if anything our Medical Center needs to do to assist you in this matter.

(J.A. Vol. III at 2052.) In addition, operational guidelines issued by Captain Roberts of the Charleston police force on October 12, 1989, with copies to Solicitor Condon and to MUSC nurse Shirley Brown (one of the instigators of the MUSC program), refer to the positive drug tests as "probable cause" for arrest of the mother, on charges of possession only if the pregnancy is 27 weeks or less, and on charges of both possession and distribution to persons under 18 if the pregnancy is 28 weeks or more. (J.A. Vol. III at 1412-1414.)[2] Further, a letter from Mr. Good to a Senior Assistant Attorney General on December 19, 1989, explaining the MUSC program, states that it was developed by MUSC "[a]t the suggestion of law enforcement and the solicitor's office. . . ." (J.A. Vol. III at 1457.) These are merely a few

_____

[1] As set forth in greater detail below, seven of the plaintiffs were arrested after the birth of their children.

[2] In regard to the Title VI issue, it should be noted that the police department guidelines are not limited to cocaine only but refer to "illegal drugs" generally, which the guidelines define as "heroin, crack/cocaine, amphetamines, and any other drug illegally ingested by the patient that medical authorities deem a threat to the life and safety of the unborn child." (J.A. Vol. III at 1412.)

21

examples of the evidence in the record that supports a finding of both prosecutorial intent on the part of MUSC and substantial involvement of law enforcement officials in developing the program.

Following is a short summary of the circumstances under which the plaintiffs in this case were tested and arrested:

Sandra Powell, African-American, received prenatal care at MUSC from the end of her first trimester. (J.A. Vol. I at 322.) In October 1989, she delivered her child at MUSC and tested positive for cocaine. (J.A. Vol. III at 1842-44, 1853.) She was arrested at the hospital the following day. (J.A. Vol. III at 1844, 1852.)

Lori Griffin, African-American, received prenatal care at MUSC beginning in July 1989. (J.A. Vol. III at 1563.) She was admitted to the hospital on October 7, 1989, with contractions. (J.A. Vol. III at 1560.) She tested positive for cocaine. (J.A. Vol. III at 1559.) She was arrested and taken to the county jail. (J.A. Vol. III at 1560, 1563.) She was returned to MUSC from jail on October 25, 1989, to deliver her child.

Ellen Knight, African-American, received prenatal care at MUSC prior to the fall of 1989. (J.A. Vol. I at 293.) She arrived at the hospital on November 6, 1989, in labor. (J.A. Vol. III at 1698.) Although her cocaine test was negative, her child tested positive at birth. (J.A. Vol. III at 1705, 1707.) She was arrested at the hospital on November 8, 1989.

Laverne Singleton, African-American, delivered her child on November 9, 1989, in the ambulance on the way to MUSC. (J.A. at I 225; Vol. III at 1859, 1865.) She tested positive for cocaine at the time of admission. (J.A. Vol. III at 1859-60.) She was arrested at the hospital the next morning. (Id.)

Paula Hale, African-American, first arrived at MUSC in December 1990 in labor. (J.A. Vol. III at 1581-83.) She tested positive for cocaine at delivery and was referred to substance abuse counseling. (Id.) She was arrested in March 1991 after failing to complete the drug treatment program. (J.A. Vol. III at 1585-86.)

22

Pamela Pear, African-American, arrived at MUSC in July 1990 with pre-term labor symptoms. (J.A. Vol. III at 1817.) She tested positive for cocaine during that visit. (Id.) She was referred to substance abuse counseling. (J.A. Vol. III at 1736.) In August 1990, she was again admitted to MUSC for pre-term labor and tested positive for cocaine. (J.A. Vol. III at 1757.) She was arrested at the hospital and was released on bond the same day. She delivered her child at MUSC in September 1990. (J.A. Vol. III at 1765.)

Theresa Joseph, who was multi-racial,[3] was first seen at MUSC on June 5, 1991, for a non-pregnancy related matter. (J.A. Vol. III at 1599.) She tested positive for cocaine at that time and was referred to the obstetrical clinic. (J.A. Vol. III at 1601-02.) She was admitted to the hospital again, for the same non-pregnancy complaint, on June 13, 1991. She again tested positive for cocaine and was referred to substance abuse counseling. (J.A. Vol. III at 1612, 1626.) She failed to complete the substance abuse program in July 1991. (J.A. Vol. III at 1656, 1682.) She was seen again in September 1991 and once more tested positive for cocaine. (J.A. Vol. I at 515; Vol. III at 1628-29.) Finally, she arrived at MUSC in October 1991 in labor and tested positive for cocaine. (J.A. Vol. III at 1632, 1634.) Her child was born on October 18, 1991, and Ms. Joseph was arrested at the hospital. (Id.)

Crystal Ferguson, African-American, tested positive for cocaine during a prenatal visit to MUSC in June 1991. (J.A. Vol. III at 1530.) She agreed to attend substance abuse counseling. (J.A. Vol. III at 1537.) On August 4, 1991, she delivered her child at MUSC. She tested positive for cocaine at that time. (J.A. Vol. III at 1533.) She was arrested on August 7, 1991, for failing to comply with the drug treatment program. (J.A. Vol. III at 1541.)

Patricia Williams, African-American, received prenatal care at MUSC beginning in January 1992. (J.A. Vol. III at 1910.) She tested positive for cocaine at the time of her first visit and was referred to substance abuse counseling. (J.A. Vol. III at 1903, 1939-40.) She did not complete the counseling program and returned for additional prenatal care three times, testing positive for cocaine each time. (J.A.

_____

[3] Ms. Joseph is now deceased. She was described as "black" on her Charleston Police Department Incident Report. (J.A. Vol. III at 1655.)

23

Vol. III at 1901-02, 1907.) In March 1992, she arrived at the hospital in labor. (J.A. Vol. III at 1910-11.) She again tested positive for cocaine. (Id.) Her baby was born on March 10, 1992, and on March 12, 1992, she was arrested at the hospital. (Id.)

Darlene Nicholson, Caucasian, received regular prenatal care at MUSC. (J.A. Vol. I at 447-48, 450; Vol. III at 1717, 1724.) At her December 17, 1993 prenatal visit she tested positive for cocaine. (J.A. Vol. I at 452-53.) At that time, she was told that she must voluntarily admit herself to the MUSC psychiatric unit for substance abuse treatment or she would be arrested. (Id.) She entered the psychiatric unit and remained there until she was released after 30 days. (J.A. Vol. III at 1717.) She delivered her child at MUSC on February 21, 1994. (J.A. Vol. I at 458.)

In none of these cases was a warrant obtained before the urine testing was done or before the results were turned over to the police and the plaintiffs were arrested. Furthermore, the consent forms signed by the plaintiffs did not advise them that their drug test results would be disclosed to the police. The majority excuses the lack of a warrant, or indeed any determination of probable cause, by relying on the "special needs" exception to the ordinary Fourth Amendment requirement that a warrant be obtained.

II.

The Supreme Court has held that

> where a Fourth Amendment intrusion serves special governmental needs, <u>beyond the normal need for law enforcement</u>, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.

<u>National Treasury Employees Union v. Von Raab</u>, 489 U.S. 656, 665-66 (1989) (emphasis added). Similarly, the Court has instructed that

> When such "special needs" -- <u>concerns other than crime detection</u> -- are alleged in justification of a Fourth Amend-

24

ment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties.

Chandler v. Miller, 520 U.S. 305, 314 (1997) (emphasis added). Several aspects of the "special needs" exception require careful analysis in the context of this case.

First, as the emphasized portions of the above quotations make clear, the "special needs" exception does not apply where the governmental intrusion is intended to be used for law enforcement purposes. In Von Raab, the issue was whether "it violates the Fourth Amendment for the United States Customs Service to require a urinalysis test from employees who seek transfer or promotion to certain positions." 489 U.S. at 659. The Supreme Court in that case held that the Fourth Amendment permitted the suspicionless testing of employees who applied for positions directly involving the use of firearms or the interdiction of illegal drugs. Id. at 679. In reaching this conclusion, the Court applied a "special needs" analysis, balancing the individuals' privacy interests against the non-law enforcement governmental interests served by the urinalysis policy. Significantly, in deciding to apply the "special needs" balancing test to the facts before it, the Court emphasized that "[i]t is clear that the Customs Service's drug-testing program is not designed to serve the ordinary needs of law enforcement. Test results may not be used in a criminal prosecution of the employee without the employee's consent." Id. at 666 (emphasis added). In fact, in none of the cases relied on by the majority, other than the sobriety checkpoint and probation supervision cases which will be addressed below, were the results of the drug tests or other searches intended for use in a criminal prosecution. See Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 651 (1995) (authorizing only certain school officials to have access to test results); Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 621 & n. 5 (1989) ("While [the provision permitting drug testing of railroad personnel] might be read broadly to authorize the release of biological samples to law enforcement authorities, the record does not disclose that it was intended to be, or actually has been, so used."); Yin v. State of California, 95 F.3d 864, 869, 873 (9th Cir. 1996) (state employee required to submit to medical examination solely to determine her ability to perform normal work duties); Dimeo v. Griffin, 943 F.2d

25

679, 685 (7th Cir. 1990) (en banc) (jockeys and other participants in horse racing required to undergo random drug tests as condition of occupational licensure). In sharp contrast, nine out of ten of the plaintiffs in this case were arrested based on the test results, and one avoided arrest only by committing herself to a psychiatric unit. Under these circumstances, I believe the "special needs" exception does not apply.

The majority cites <u>Michigan Department of State Police v. Sitz</u>, 496 U.S. 444 (1990), and <u>Griffin v. Wisconsin</u>, 483 U.S. 868 (1987), for the proposition that the defendants' intention to use the results of the drug tests as probable cause to arrest the plaintiffs in this case does not preclude application of the special needs balancing test. In <u>Sitz</u>, however, the Supreme Court was careful to explain that the special needs exception applied only to the suspicionless "seizure," that is, the initial stop of each motorist and the associated preliminary questioning and observation, 496 U.S. at 450-51, which the Court characterized as only a "slight" intrusion. <u>Id.</u> at 451. The Court specifically noted that the "[d]etention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard." <u>Id.</u> at 451 (citing <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 559 (1976)). The <u>Sitz</u> balancing test, which justifies the relatively slight intrusion of a checkpoint seizure, does not serve also to justify searches of the motorists' persons or effects without consent or probable cause. <u>See United States v. Ortiz</u>, 422 U.S. 891, 896-97 (1975). <u>Griffin</u> also is readily distinguishable. In that case, the Supreme Court upheld the validity of a warrantless search conducted by a state probation officer at the home of a criminal defendant on probation under a regulation which permitted such searches as long as the probation officer had "reasonable grounds" to believe the probationer possessed contraband forbidden under the conditions of his probation. The Court noted that probation was a form of criminal sanction imposed <u>after</u> a finding of guilt, 483 U.S. at 874, and supervision of probationers was a "`special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." <u>Id.</u> at 875.

Accordingly, I believe the majority reads <u>Sitz</u> and <u>Griffin</u> too broadly in suggesting that the special needs exception can justify a

26

suspicionless search of a member of the public intended to produce evidence for use in a criminal arrest.

In this case, the MUSC policy was intended from its inception to result in the arrest and possible prosecution of pregnant women who were patients at the state hospital. In all the other special needs cases cited by the majority, arrest was at most an incidental possibility and not a direct result of the warrantless Fourth Amendment intrusion sought to be justified. It is simply inconsistent with the record in this case to identify the drug testing imposed by MUSC as not serving normal law enforcement needs. I would find that the avowed and actual purpose of arresting patients who tested positive for cocaine, as well as the extensive involvement of law enforcement officials in designing and implementing the policy, preclude application of the special needs analysis in this case.

Even if I assume, however, that a special needs balancing test should be applied, and further assume that the governmental interest identified by the majority -- i.e., the adverse effect of maternal cocaine use on the health of children exposed to cocaine in utero -- is substantial, I believe that the policy fails the test of "effectiveness," i.e., "[t]he degree to which the search advances the public interest." See Sitz, 496 U.S. at 453. It is undisputed that seven of the plaintiffs were arrested after giving birth (indeed, several were taken into custody at the hospital wearing only their hospital gowns), rather than during the prenatal period.[4] By that time, any adverse effect of maternal cocaine use on the developing fetus had already occurred, and the arrest could only have had a punitive rather than a preventive purpose.

Nor is it correct to say that the degree of intrusion on the mother's privacy was "minimal" simply because the test occurred in the context of a hospital examination. Unlike the policy in Von Raab, under the MUSC policy the test results are reported not simply to a licensed physician, but to law enforcement officials with no medical reason for receiving the information. Cf. Von Raab, 489 U.S. at 672 n.2 (noting

_____

[4] Moreover, several of the plaintiffs who were not arrested until after giving birth had tested positive for cocaine multiple times during the prenatal period when, according to the purported purpose of the policy, intervention was crucial.

27

as one of the procedures that minimized the intrusiveness of the drug-screening program that "an employee need not disclose personal medical information to the Government unless his test result is positive, and even then any such information is reported to a licensed physician").

For all the above reasons, I agree with the trial court that the drug testing policy applied to the plaintiffs in this case violated the Fourth Amendment, in the absence of valid consent.

The district court also properly found that the various consent forms signed by the plaintiffs, which did not advise them that the drug test results would be disclosed to the police, did not alone establish valid consent. Accordingly, the court submitted this case to the jury on the issue of consent, and the jury returned a verdict in favor of the defendants. The plaintiffs moved for judgment under Fed. R. Civ. P. 50(b), and the court denied the motion.

I disagree that the evidence presented at trial was sufficient to sustain the jury's verdict. When considering a Rule 50(b) motion for judgment as a matter of law, the district court must view the evidence in the light most favorable to the non-moving party and then determine whether a reasonable jury could draw only one conclusion from the evidence. See Townley v. Norfolk & Western Ry. Co., 887 F.2d 498, 499 (4th Cir. 1989). We review the district court's ruling on a Rule 50(b) motion by applying the same standards de novo. Id. In addition to the consent forms, the defendants presented other evidence, such as letters that either accompanied the forms or were distributed after a positive test result, and a public service announcement issued by the Solicitor's Office in 1990. The public service announcement indicated that pregnant women who tested positive for drug use could be subject to prosecution; however, it was seen by only two of the plaintiffs. (J.A. Vol. I at 374, 518-19.) The plaintiffs' presumed familiarity with this information, even when combined with a general knowledge that use of cocaine is illegal, is not sufficient to establish the plaintiffs' voluntary and knowing consent to the possible use against them in a criminal case of drug test results taken in the course of their pregnancy and labor. Cf. Von Raab, 489 U.S. at 666 (positive test results "may not be used in a criminal prosecution without the employee's consent"). I also question whether consent can be volun-

28

tary, in a constitutional sense, when given by an indigent, uninsured woman in labor, who is dependent on medical care provided by the state's public hospital. If the special needs exception had been held not to apply, a more thorough analysis of this issue would have been necessary.

III.

I agree with the majority's analysis of the Title VI issue, except with regard to the availability of an equally effective alternative policy with a less discriminatory impact.[5] The plaintiffs point out, correctly, that the urine tests being performed under the MUSC policy indicate a patient's past use, not just of cocaine, but of other illegal drugs as well. (J.A. Vol. II at 1336-42.) Consequently, applying the policy to the past use of all illegal drugs, not just cocaine, as the plaintiffs suggested, would <u>not</u> have increased the cost of the testing. The district court's finding that testing for all illegal drugs "would be prohibitively expensive," therefore, is not supported by the record. In affirming the decision below, the majority states that the plaintiffs have not challenged the district court's factual finding "that application of the policy -- including its tracking and reporting requirements -- to all drugs would have been prohibitively expensive." The district court, however, made no such finding. In considering the alternative of focusing on all illegal drugs, not just cocaine, the court relied only on the cost of testing, not tracking or reporting, to reject that alternative.[6] (J.A. Vol. IV at 2746). Since the plaintiffs have shown that their proposed alternative of applying the testing policy to past use of any illegal drug would not have resulted in any additional cost, the district court's fact-finding on the issue of the cost of testing is clearly erroneous, and the plaintiffs have carried their burden of demonstrating the availability of an equally effective alternative with a less discrimina-

_____

[5] The appellants' brief challenges the factual findings of the district court concerning the cost of the testing program and the overall effectiveness of the policy. (Brief of Appellants at 49).
[6] Nor is any evidence on this issue apparent in the record, except for evidence suggesting that the Charleston Substance Abuse Clinic, not MUSC, would notify police regarding missed substance abuse appointments, (J.A. Vol. III at 1430), and that the Solicitor's Office would be responsible for tracking compliance, generally. (J.A. Vol. I at 610-11.)

tory impact.**7** Accordingly, I would reverse the judgment in favor of the defendants on the Title VI claim and remand for consideration of injunctive relief.

IV.

In summary, I would reverse the district court on the Fourth Amendment and Title VI claims, and remand for consideration of appropriate relief. On these two issues, respectfully, I dissent.

_____

**7** The plaintiffs have not shown that the district court erred in rejecting their second alternative, i.e., testing <u>all</u> maternity patients at MUSC.

30