NIEMEYER, Circuit Judge,
concurring in the judgment in part and dissenting in part:
Under the limited review that we are now directed to conduct by the remand order of the Supreme Court and that is required by the deferential standard applicable to that review — taking the facts in a light most favorable to the Medical University of South Carolina' — -I would affirm the jury’s verdict. Even if I were to apply the new legal standard for consent articulated in dictum by the Supreme Court in its remand order, I would affirm with respect to nine of the appellants, either because the facts support a finding that the search under Policy M 7 was consented to with full knowledge or because the appellant’s claim did not implicate the Policy. Under this new standard, I would reverse the judgment only as to Laverne Singleton because of an insufficiency of evidence to demonstrate her knowledge of the consequences of her voluntarily supplying a urine sample. My reasons follow.
*405 I
The ten women who are plaintiffs in this action contend that Policy M-7 of the Medical University of South Carolina (“MUSC”) — providing that urine samples, given by certain pregnant women, be screened for the presence of illicit drugs and that the results be forwarded to law-enforcement authorities for prosecution— violated their right against unreasonable searches, as protected by the Fourth Amendment. The district court rejected MUSC’s claim that the purported searches were justified by the “special needs” exception to the Fourth Amendment, but, following a trial, a jury found that each of the ten plaintiffs consented to the searches, and therefore the Fourth Amendment was not implicated.
On appeal, we affirmed, but not on the issue of consent. We concluded that the searches themselves were reasonable under the “special needs” doctrine, which justifies certain searches designed to serve non-law-enforcement ends — in this case the medical interests of the mothers and the babies — even though law-enforcement means were employed. Ferguson v. City of Charleston, 186 F.3d 469, 477 n. 7, 479 (4th Cir.1999); see also Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652-53, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); Mich. Dep’t of State Police v. Sitz, 496 U.S. 444, 451-55, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). We grounded our holding on the conclusion that the urine drug screens conducted under the Policy were, in fact, for medical purposes wholly independent of the incidental law-enforcement efforts and that the law-enforcement efforts were intended to reinforce the medical purposes. Ferguson, 186 F.3d at 477.
On review by certiorari, the Supreme Court reversed our judgment and remanded the case for further proceedings. Ferguson v. City of Charleston, 532 U.S. 67, 86, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). The only issue decided by the Supreme Court was whether the MUSC policy was a search justified by the “special needs” doctrine. On this issue, the Court concluded:
While the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence for law enforcement purposes in order to reach that goal. The threat of law enforcement may ultimately have been intended as a means to an end, but the direct and primary purpose of MUSC’s policy was to ensure the use of those means. In our opinion, this distinction is critical.... Given the primary purpose of the Charleston program, which was to use the threat of arrest and prosecution in order to force women into treatment, and given the extensive involvement of law enforcement officials at every stage of the policy, this case simply does not fit within the closely guarded category of “special needs.”
Id. at 82-84, 121 S.Ct. 1281. Distinguishing its earlier cases in which it justified drug testing, the Court said that “[i]n each of those earlier cases, the ‘special need’ that was advanced as a justification for the absence of a warrant or individualized suspicion was one divorced from the State’s general interest in law enforcement.” Id. at 79, 121 S.Ct. 1281. The Court then reiterated its basis for concluding differently in this case, stating that “the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment.” Id. at 80, 121 S.Ct. 1281.
*406 The Court explicitly did not review the question of whether the patients gave their consent to the searches, as the jury had found. Rather, on this point, the Court said, “[W]e necessarily assume for purposes of our decision — as did the Court of Appeals — that the searches were conducted without the informed consent of the patients.” Id. at 76, 121 S.Ct. 1281; see also id. at 77, 121 S.Ct. 1281. After reversing on the one issue that it did decide, the Court remanded the case for our review on the previously unreviewed question of whether the jury had evidence to support its finding of consent. As dictum, the Court explained that hospital employees have “a special obligation to make sure that the patients are fully informed about their constitutional rights, as standards of knowing waiver require.” Id. at 85, 121 S.Ct. 1281. In making that statement, however, the Court did not review its jurisprudence of consent, nor did it appear to be adopting a new standard for giving consent and thereby overruling the preexisting law. Under the pre-existing law, consent to waive a Fourth Amendment right did not depend on a knowing and intelligent decision or on full or accurate information but rather whether the defendant “voluntarily” provided the information, regardless of whether the act was knowing or intelligent or whether the inducement was complete, true, or accurate. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 235-46, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Hoffa v. United States, 385 U.S. 293, 300-02, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Were it otherwise, the procedures of law enforcement would have been dramatically changed, and doubt would be cast upon virtually every consent that is routinely given today without full knowledge of the consequences. See Schneckloth, 412 U.S. at 243, 93 S.Ct. 2041 (noting that it would be “next to impossible” to apply such a standard).
If mere “voluntariness” remains the correct standard for waiving a governmental search, then it is beyond dispute that the jury had, in each instance in this case, sufficient evidence to support its finding of voluntariness. There is no evidence that any patient was compelled to provide a urine sample or that any patient objected to providing one when requested to do so by medical authorities. And the majority agrees with this observation. See ante at 390 n. 8. Indeed, even before adoption of Policy M-7, it was established medical protocol to obtain urine samples for medical purposes when the patient presented signs that she may have been on drugs during her pregnancy. As testified to by Nurse Shirley Brown, the Obstetrics Case Manager at MUSC, MUSC had been following such a medical protocol before adoption of Policy M-7, and the adoption of Policy M-7 in October and November of 1989 was only intended to put teeth into the preexisting protocol by systematically subjecting the patient to the possibility of prosecution for the abuse of drugs revealed by the drug screen tests.
But even if the standard suggested by the Supreme Court by dictum turns out unwittingly to be a new standard, the evidence, in my judgment, supports the jury’s finding of consent in favor of MUSC in at least five of the instances presented. Under this “new” standard, the inquiry stated by the majority is the appropriate one: (1) did the patient have knowledge that the urine screens could be used as a basis for arresting the patient and (2) did the patient, having that knowledge, provide the urine samples voluntarily. Because there is no evidence that the urine samples were coerced, the only factual question is whether the patients provided those samples with knowledge that the test results might be used for prosecutorial purposes.
*407 II
In reviewing the jury’s findings in this case, it is important first to understand the law that the jury was applying. The district court, after telling the jury that there were no search warrants in this case, instructed the jury that any finding of a constitutional search depended on the patient’s consent. The court said:
There not being a warrant issued, [the searches] are unreasonable and in violation of the Constitution of the United States, unless the defendants have shown by the greater weight or preponderance of the evidence that the plaintiffs consented to those searches.
[I]t is conceded by the parties that if the searches were consented to then they are constitutional. And again you may reach a different conclusion as to consent from plaintiff to plaintiff. That doesn’t have to be so, that’s dictated by the facts. But it doesn’t mean that if there is consent in one case that there is necessarily consent in the other or vice versa. Again, you have to look at the facts that relate to each plaintiff and reach a decision on the question of consent.
After telling the jury that the State carried the burden of proving consent, the court then proceeded to explain how the jury was to conclude whether each defendant consented:
The matter of consent more often than not is discussed in terms of volun-tariness and willingness to give the consent. But before there can be any vol-untariness, before there can be any consent, there must be knowledge. The person giving the consent must have knowledge of what she is doing. It’s basic that before you can consent to something, you have got to know what it is. You have to have enough information to know what is being done before you can consent to it. And the scope of the consent must be broad enough to include the search in question. Consent for one purpose may be broad enough to cover one actor, but may not be broad enough to cover another actor.
The written consent in this case may be sufficient to cover the taking of a urine sample and the testing thereof by Medical University of South Carolina officials alone, but it is not sufficient to cover the sharing of that information with law enforcement officials. That written consent is not sufficient consent to warrant a search where the search information is furnished to law enforcement officers. There must be something in addition to that written consent before you can say that these were consent searches.

And therefore to show that there is a valid consent in this case there must be something else that convinces you that the plaintiffs consented not only to the taking of this urine for the use by the medical people, but also the sharing of it with law enforcement people for the possibility of prosecution for drug offenses.

(Emphasis added).
Thus the district court instructed the jury to decide both whether the plaintiff— patients had knowledge that their urine screens could be used to prosecute them and whether their giving urine samples, in light of this knowledge, was voluntary. And applying these instructions to the facts, the jury found that each of the appellants knowingly and voluntarily consented to the searches.
*408 III
Recognizing that the jury was not misin-structed, even under the “new” standard, we need only concern ourselves with the question of whether there was evidence from which the jury could reasonably have reached the conclusion that consent was in fact given. Benesh v. Amphenol Corp. (In re Wildewood Litig.), 52 F.3d 499, 502 (4th Cir.1995). In applying this standard of review, we take the evidence in a light most favorable to MUSC. Id.
The record shows that before Policy M-7 was adopted in mid-October or November 1989, MUSC utilized a medical protocol solely for medical reasons to test urine samples of pregnant women who presented themselves with certain medical conditions. Nurse Brown testified that, under this pre-Policy medical protocol, “if people met certain criteria that were listed that were published by the faculty, you know, to go out into the climes that the following are indicators and would need to be screened, you know, for medical evaluation, then they would have [been screened].” She explained that the urine screen for drugs would be prescribed under the protocol if the patient had “no prenatal care, late prenatal care, abruptio placentae, intrauterine fetal- death, preterm labor, and there was one other one that was supposed to be screened prenatally or at delivery.” This protocol was adhered to by all physicians and was communicated to medical residents by memorandum. Thus, when a patient was abrupting, “the placenta was separating, [and] it was putting her life and [the] baby’s life in jeopardy, ... the physician order[ed] a [urine drug] test as part of many tests that they order.” Under the protocol, if the drug screen proved positive for drug abuse, the woman was counseled about the harmful effects of drugs on her and her child and was referred to substance abuse treatment. No one has argued that this pre-Policy medical protocol involved an unconstitutional search.
Policy M-7, the subject of this case, was agreed upon by MUSC, the police, and the solicitor (chief prosecuting attorney) on or about October 12, 1989, when the police department sent Nurse Brown a proposed form of the Policy to which the various entities had agreed orally. This communication was followed by a memorandum dated October 17 actually announcing the “policies concerning drug abusing pregnant women.” And, thereafter, Policy M-7 was formally adopted as part of the MUSC medical center policy manual on November 27, 1989. As announced and informally adopted, Policy M-7 included a form solicitor’s letter dated October 18, 1989, addressed to patients and candidly warning them of their potential arrest: “Please understand that by using drugs during pregnancy, you are risking death or at least severe long-term harmful effects to your baby. If you fail to obtain Substance Abuse and Pre Natal Care, you will be arrested by Charleston City Police and prosecuted by the Office of Solicitor.” The date of the solicitor’s letter, which was to be employed as part of the Policy, confirms when Policy M-7 was informally implemented, as does the testimony of Nurse Brown. Summarizing her testimony, the district judge stated, “She has testified, as I understand it, to two things. She said late October of '89 or the first part of November of '89 the policy was first adopted,” and the plaintiffs’ attorney agreed with that summary. (J.A. 587.) In short, on or about October 17 or 18, 1989, Policy M-7 was first adopted, albeit informally, and beginning then, it authorized drug screening, the results of which could be used to support arrests of pregnant women.
*409 A modification of Policy M-7, providing a second chance to patients testing positive for drugs if they successfully completed treatment, was adopted in January 1990. And during this period, a public service announcement was developed and broadcast publicly and privately to patients. That announcement stated:
When you’re pregnant, just one line of cocaine, a single hit of crack, rushes to your baby’s body and brain. Within minutes your body can be jolted into premature labor risking a still developing child to stroke, even death. And not only will you live with the guilt, you could be arrested.
But this is a tragedy you can prevent. If you have a problem with drugs talk to your doctor or call MUSC at 792-6437. Trained counselors will guide you through drug rehabilitation and advise you about good prenatal care. And if you stay with the program, you will not be arrested or prosecuted.
Wake up from the nightmare. Think about your baby first.
It is against these facts about when Policy M 7 was adopted and implemented that we must consider the personal circumstances of the appellants in this case.
IV
The record evidence shows that Lori Griffin and Sandra Powell each gave urine samples to MUSC under MUSC’s medical treatment protocol as it existed before adoption of Policy M-7 and thus the screens were not searches implicating the Fourth Amendment. Griffin signed an ambulatory consent form on June 28, 1989, then gave a urine sample, and tested positive for cocaine. On October 7,1989, again before Policy M-7 was adopted, Griffin went to MUSC for pre-term labor. During this admission, she gave another urine sample that tested positive for cocaine. As she was released from the hospital, she was arrested on the basis of the positive showing and remained in custody until she delivered her baby on October 26. In January 1990, Griffin was indicted for possession of cocaine and distribution of cocaine to a minor on October 6 and 7, 1989, as revealed by medical testing conducted before the implementation of Policy M-7.
Powell similarly signed an ambulatory consent form on May 24, 1989, when she came to MUSC for prenatal care before Policy M-7 came into effect. On October 13, 1989, she was taken to MUSC in an ambulance when she went into labor, and at the time of that admission, a urine sample was provided. It tested positive for cocaine, and the next day, Powell was arrested on the basis of that medical record for her cocaine abuse. Again, all of this occurred before adoption of Policy M-7.
With respect to each of these patients, I submit that, and certainly the jury could have found that, the urine tests were conducted pursuant to the medical protocol in existence before Policy M-7 and that the urine samples were voluntarily provided for medical reasons. No appellant has contended that the medical protocol as it existed before the adoption of Policy M-7 in mid-October and early November 1989 was conducted for prosecutorial purposes and thereby violated the Fourth Amendment.
With respect to the urine samples provided by Pamela Pear, Paula Hale, Crystal Ferguson, Theresa Joseph, and Patricia Williams, Policy M-7 was fully in effect. But in each case, when a sample was taken and tested, the prosecutorial potential was explained to the patient. Indeed, the majority opinion agrees that Pear was aware that MUSC was testing pregnant women for illegal drugs and that she knew that *410 MUSC had a policy regarding arresting women who used illegal drugs during pregnancy. Hale similarly had full knowledge of the Policy. She came to MUSC on December 13, 1990, and delivered a baby. Urine samples provided at her delivery tested positive for cocaine. She signed a copy of the solicitor’s letter specifically warning of arrest and has admitted to knowing at the time that drug screens at MUSC were being used to support arrests of pregnant women. And Ferguson likewise had full knowledge. She came to MUSC because she was using drugs and needed help. She signed the consent form, viewed the public service announcement warning of dangers of using drugs and warning that she could be arrested, and signed the solicitor’s letter, which specifically warned patients that they could be arrested. Again, Joseph also saw the public service announcement and, on presenting herself to MUSC, signed a consent form. In addition, she signed the solicitor’s letter specifically warning her of the potential for arrest. Finally, Williams specifically asked to be transferred from North Charleston Health Department to MUSC for prenatal care because of her drug problem. She had heard about the MUSC policy and admitted knowing that MUSC was testing women for the presence of drugs. When she presented herself at MUSC, she signed the consent form and tested positive. She was then shown the video on substance abuse, given a copy of the solicitor’s letter and scheduled for an appointment at the Charleston County Substance Abuse Center. With this information, Williams gave urine samples on two occasions thereafter, as well as an additional time at the delivery of her baby. On each of these three occasions, she tested positive for drug abuse. Thus, with respect to each of these five appellants, the record amply supports the jury’s conclusion that the patients were fully informed of prosecutorial purposes when they provided their urine samples for drug testing.
The facts relating to Laverne Singleton are distinguishable from these five and do not support a finding that she consented to use of test results for prosecutorial purposes. Singleton delivered two children through the medical assistance of MUSC. In connection with her first child, delivered on November 9, 1989, a postpartum urine screen tested positive for cocaine. She had received no prenatal services at the obstetrics clinic. She admitted at the time that she consented to the urine drug screen because she “thought she was clean.” Based on the November 9 test, she was arrested. During the course of a second pregnancy in 1990, she had two positive drug screens. When she was admitted for delivery in November 1990, she again tested positive for cocaine. As an alternative to arrest for drug abuse, Singleton voluntarily admitted herself to inpatient treatment at the MUSC Institute of Psychiatry. While her arrest in 1989 shows her knowledge of the Policy when she submitted samples with respect to her second pregnancy and delivery in 1990, the record fails to support a finding that she had knowledge of the Policy or of prosecu-torial purposes when she was tested in 1989. Accordingly, under the “new” standard under which we are now considering Singleton’s claim, I would conclude that a reasonable jury could not find that Singleton consented to the search in 1989 that led to her arrest.
With respect to Ellen Knight, the majority opinion concludes that she does not have standing to assert a claim because only her child’s urine was tested. I agree. And with respect to Darlene Nicholson, the majority opinion concludes that she was tested after the Policy had been discontinued. While the majority opinion would remand Nicholson’s claim to deter *411 mine whether in fact she was searched under the Policy, I respectfully submit that the burden is on Nicholson to demonstrate that she was searched pursuant to the Policy, and she has failed to carry that burden.
V
In adopting, modifying, and implementing Policy M-7, MUSC has made a serious effort to address a serious problem — a problem that exists not only in South Carolina but also nationwide. Drug abuse by pregnant women harms the woman as well as the fetus that she carries, permanently injuring the fetus and imposing on the baby a life-time of problems from birth. Far beyond the problems of the mother and child are the enormous social problems borne by the community. Even as well-intended as Policy M-7 may be, it must nonetheless comport with constitutional constraints. The Supreme Court has concluded that coupling the medically necessary drug testing of women who present evidence of drug abuse with the concomitant purpose of prosecuting them based on the results of the drug tests is not justified by a “special needs” exception to the Fourth Amendment. The Court held that only if such testing were, as a factual matter, consented to could such a search be made, and on the consent question, the Court committed the issue to us to resolve.
I respectfully submit that the record amply supports the jury’s finding that all of the women voluntarily supplied urine samples for testing. And, if we must require an informed consent, the record amply supports the jury’s finding that five of the women — Pamela Pear, Paula Hale, Crystal Ferguson, Theresa Joseph, and Patricia Williams — knowingly consented to the searches and that four other women do not have claims because three — Lori Griffin, Sandra Powell, and Darlene Nicholson — submitted urine samples under a purely medical protocol, and Ellen Knight was never personally tested under the Policy. Only as to Laverne Singleton does the evidence fail to support the district court’s judgment under this standard.
Accordingly, on remand from the Supreme Court, I would affirm, or, alternately, I would reverse the judgment of the district court as to Singleton and affirm as to the other appellants.